J-S16027-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RANDALL D. BROOKS, | |
| Appellant | No. 953 MDA 2014 |

Appeal from the Judgments of Sentence of
July 3, 2012 and August 31, 2012
In the Court of Common Pleas of Centre County
Criminal Division at Nos: CP-14-CR-0000141-2012, CP-14-CR-0000568-
2011, CP-14-CR-0001515-2011, CP-14-CR-0001927-2010
and CP-14-CR-0002130-2010

BEFORE:  PANELLA, OLSON AND OTT, JJ.

MEMORANDUM BY OLSON, J.:                              **FILED JUNE 02, 2015**

Appellant, Randall D. Brooks, appeals from the judgments of sentence entered on July 3, 2012 and August 31, 2012, as made final by the denial of his post-sentence motion on August 31, 2012.  We affirm in part, vacate in part, and remand for resentencing.

The factual background of this case is as follows.  In November 2009, Appellant and Jessica Rooney ("Rooney") ended their romantic relationship.  Shortly thereafter, Rooney began dating Matthew Ross ("Ross").  Ross worked next to the car repair business where Appellant worked.

On December 11, 2009, Rooney and Ross went on a date.  During that date, Appellant sent numerous text messages to Rooney.  In response, Ross

used Rooney's telephone to inform Appellant that Rooney was at Ross' house drinking. Upon receiving this message, Appellant drove to Ross' house. Appellant drove through a neighbor's yard and parked in Ross' backyard. When Ross and Rooney arrived back at Ross' residence, Ross exited his vehicle and a verbal confrontation between Appellant and Ross ensued. Appellant demanded to talk to Rooney and advanced towards her, while she remained seated in Ross' vehicle. Ross attempted to restrain Appellant and a physical altercation followed. Eventually, Appellant left Ross' residence.

On December 14, 2009, Ross picked Rooney up at her mother's residence. Once Rooney entered Ross' vehicle, Appellant pulled behind Ross' vehicle and blocked their exit. Ross therefore drove through the front yard of the home in order to leave the area without confronting Appellant. On December 18, 2009, Appellant told Rooney that Ross was lucky that Appellant didn't shoot him.

On December 29, 2009, as Ross was driving to work, Appellant pulled up beside Ross' vehicle and fired three shots. The third shot struck Ross in the shoulder. As a result of his wounds, Ross continues to experience medical problems, *inter alia*, limited use of his left arm. On January 27, 2010, Appellant was seen continually driving near Ross' residence when he, his family, Rooney, and Rooney's daughter returned from shopping.

Appellant eventually confessed to Rooney that he was the individual who shot Ross. He also continued to harass her by approaching her in

public, leaving her notes, and writing letters from prison. While awaiting trial, Appellant requested that his father pay one of the jurors to find him not guilty of the charged offenses. He also requested his father change the appearance of the taillights of the vehicle he was driving during the shooting.

When Appellant returned to jail from jury selection on June 7, 2011, he spoke to fellow inmate Joshua Dunlap ("Dunlap"). Appellant had recognized one of the jurors as Brent Kephart ("Kephart"). Appellant was aware that Dunlap knew Kephart. He therefore asked Dunlap to contact Kephart once Dunlap was released on bail in order to discuss Appellant's case. On the morning Dunlap was released from jail, Appellant told Dunlap that both he and Kephart would receive financial compensation if they complied with his wishes.

The relevant procedural history of this case is as follows. Appellant was charged via five criminal informations with five counts of witness intimidation,[1] two counts of aggravated assault,[2] two counts of stalking,[3] two counts of harassment,[4] two counts of solicitation to commit evidence

---

[1] 18 Pa.C.S.A. § 4952.

[2] 18 Pa.C.S.A. § 2702.

[3] 18 Pa.C.S.A. § 2709.1.

[4] 18 Pa.C.S.A. § 2709.

tampering,[5] one count of solicitation to commit perjury,[6] one count of attempted murder,[7] one count of possessing an instrument of crime,[8] one count of recklessly endangering another person,[9] one count of aggravated jury tampering,[10] and one count of conspiracy to commit aggravated jury tampering.[11]  Appellant averred that he was unable to afford an attorney and, therefore, Attorney Brian Manchester was appointed to represent Appellant.

On June 28, 2011, Appellant moved *in limine* to bar the expert testimony of Trooper Todd Neumyer regarding ballistic evidence.  Soon thereafter, Attorney Manchester withdrew as counsel.  Attorney Karen Muir was appointed to represent Appellant.  The trial court then held a hearing on Appellant's motion *in limine*.  On November 3, 2011, the trial court denied the motion *in limine*.

On January 31, 2012, Appellant requested that the trial court terminate Attorney Muir and appoint new counsel.  After holding an

_____

[5] 18 Pa.C.S.A. § 902, 4910.

[6] 18 Pa.C.S.A. § 902, 4902

[7] 18 Pa.C.S.A. §§ 901, 2501.

[8] 18 Pa.C.S.A. § 907.

[9] 18 Pa.C.S.A. § 2705.

[10] 42 Pa.C.S.A. § 4583.1.

[11] 18 Pa.C.S.A. § 903; 42 Pa.C.S.A. § 4583.1.

evidentiary hearing on Appellant's *pro se* request, the trial court denied the request for appointment of new counsel. Thereafter, Appellant filed a *pro se* motion pursuant to Pennsylvania Rule of Criminal Procedure 600(E). In that motion, Appellant stated that he wished to represent himself.

On April 5, 2012, Appellant requested information regarding any benefit the Commonwealth would bestow on Dunlap for his testimony. On April 12, 2012, the Commonwealth informed Appellant that it was not offering Dunlap any benefit for his testimony. The next day, Appellant filed a motion to dismiss alleging that the Commonwealth lied when it averred that Dunlap would receive no benefit for his testimony. The trial court held an evidentiary hearing on the motion and, on April 16, 2012, Appellant's motion to dismiss was denied.

Trial commenced on April 17, 2012. Each day, prior to the jury entering the courtroom, the trial court conducted a waiver of counsel colloquy with Appellant. Each time, he reaffirmed that he wished to proceed *pro se*. On April 19, 2012, Appellant was found guilty of all 19 charges.

On June 13, 2012, Appellant filed a *pro se* motion seeking reappointment of counsel. Thereafter, Attorney Muir was reappointed to represent Appellant. On July 3, 2012, a sentencing hearing was held. On July 12, 2012, Appellant filed a *pro se* post-sentence motion. Also on that date, the Commonwealth filed a post-sentence motion. On August 14, 2012, the trial court modified a portion of Appellant's sentence. On August 31,

2012, the trial court granted the Commonwealth's post-sentence motion, vacated certain aspects of Appellant's July 3, 2012 sentence, and resentenced Appellant on certain counts. After those modifications, Appellant's aggregate sentence was 36¼ to 73 years' imprisonment, including 20 to 40 years' imprisonment on the attempted murder charge. Also on August 31, 2012, the trial court denied Appellant's post-sentence motion.

On September 28, 2012, Appellant filed a timely notice of appeal. This Court dismissed the appeal for failure to file a brief. *Commonwealth v. Brooks*, 1713 MDA 2012 (Pa. Super. Nov. 26, 2013) (*per curiam*). On February 24, 2014, Appellant filed a *pro se* petition pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. § 9541-9546. Thereafter, Appellant retained private counsel who filed an amended PCRA petition. On May 8, 2014, the PCRA court granted the petition and reinstated Appellant's direct appeal rights *nunc pro tunc*. This appeal followed.[12]

Appellant presents five issues for our review:

1. Did the trial court abuse its discretion in denying [Appellant's] motion for the appointment of new counsel where he demonstrated that he had irreconcilable differences with appointed counsel that precluded counsel from representing him?

---

[12] On June 5, 2014, the trial court ordered Appellant to file a concise statement of errors complained of on appeal ("concise statement"). *See* Pa.R.A.P. 1925 (b). On June 26, 2014, Appellant filed his concise statement. On August 8, 2014, the trial court issued its Rule 1925(a) opinion. All issues raised on appeal were included in Appellant's concise statement.

2. Was [Appellant] denied his federal and state constitutional right to confrontation when the Commonwealth failed to disclose to the defense through the discovery process, any deal, promise, inducement, or benefit which the Commonwealth made or was going to make to [Dunlap], who testified against [Appellant] as to the [a]ggravated [j]ury [t]ampering charge?

3. Did the trial court err in denying the motions *in limine* seeking to exclude and/or limit the testimony of Trooper Todd Neumyer regarding his findings upon conducting ballistics testing and comparison of shotgun shell wadding, pellets, plastic shot cups, and a shotgun?

4. Did the trial court err in imposing an illegal sentence of 20 to 40 years['] imprisonment for attempted murder pursuant to 18 Pa.C.S.[A.] § 1102(c), which requires a specific finding that serious bodily injury must have resulted from the attempted murder precedent to issuing the maximum term of imprisonment of not more than 40 years?

5. Did the sentencing court abuse its discretion in violating general sentencing principles in imposing a manifestly excessive sentence of consecutive terms of imprisonment at [eight] counts, without providing sufficient reasons to justify a *de facto* life sentence of 36 years, 3 months to 73 years' imprisonment?

Appellant's Brief at 33.

In his first issue, Appellant contends that the trial court erred by denying Appellant's motion for appointment of new counsel. "Both the right to counsel and the right to self-representation are guaranteed by the Sixth Amendment to the United States Constitution and by Article I, Section Nine of the Pennsylvania Constitution." **Commonwealth v. Phillips**, 93 A.3d 847, 851 (Pa. Super. 2014) (citation omitted). "A motion for change of counsel by a defendant for whom counsel has been appointed shall not be granted except for substantial reasons." Pa.R.Crim.P. 122(C). "To satisfy this standard, a defendant must demonstrate that he has an irreconcilable

difference with counsel that precludes counsel from representing him." ***Commonwealth v. Keaton***, 45 A.3d 1050, 1070 (Pa. 2012) (internal quotation marks and citation omitted). As this Court explained, "the right to appointed counsel does not include the right to counsel of the defendant's choice. Rather, the decision to appoint different counsel to a requesting defendant lies within the discretion of the trial court." ***Commonwealth v. Smith***, 69 A.3d 259, 266 (Pa. Super. 2013), *appeal denied*, 83 A.3d 168 (Pa. 2013) (internal quotation marks and citations omitted).[13]

Appellant first contends that the evidentiary hearing on Appellant's motion was inadequate. We disagree. At the evidentiary hearing, the trial court first ascertained whether Appellant was entitled to appointed counsel. Upon determining that Appellant qualified for appointment of counsel, the trial court then explained to Appellant the law relating to appointment of replacement counsel. It explained to Appellant the burden for appointment of replacement counsel. The trial court then asked the assistant district attorney to leave the courtroom so that Attorney Muir's representation could be discussed *ex parte*. The trial court and Appellant then engaged in a

---

[13] We note that a portion of Appellant's brief on this issue appears to contend that Attorney Muir rendered ineffective assistance prior to the motion for appointment of new counsel. ***See*** Appellant's Brief at 62 (arguing that counsel's decisions were not based upon reasonable trial strategy). It is well-settled that, except in very limited circumstances not implicated in this case, ineffectiveness claims are not reviewable on direct appeal. ***Commonwealth v. Mitchell***, 105 A.3d 1257, 1266 (Pa. 2014). Thus, to the extent that Appellant argues that Attorney Muir provided ineffective assistance, that issue is not reviewable on direct appeal.

colloquy regarding the alleged irreconcilable differences between Appellant and Attorney Muir. Attorney Muir then gave her own statement regarding the alleged irreconcilable differences. The assistant district attorney then reentered the courtroom and examined Attorney Muir.

Appellant cites *Commonwealth v. Floyd*, 937 A.2d 494 (Pa. Super. 2007), in arguing that the inquiry by the trial court in this case was not sufficiently "extensive." Appellant's Brief at 58. In *Floyd*, however, this Court concluded that an inquiry which totaled 35 pages of transcript was extensive. *See id.* at 496. In this case, the total inquiry, excluding the portion of the transcript relating to Appellant's financial condition, totaled 39 pages of transcript. *See generally* N.T., 2/17/12. Although the number of pages required for an inquiry is obviously not dispositive, it is at least indicative of the extent of the inquiry.

More importantly, our review of the certified record indicates that the trial court stopped its colloquy with Appellant when he started discussing issues not germane to whether new counsel should be appointed. For example, immediately prior to termination of the trial court's colloquy with Appellant, Appellant began complaining that it was unfair that Gerald Sandusky[14] received lower bail than he did. *See* N.T., 2/17/12, at 41-42. It was at this point that the trial court appropriately ended the colloquy. Thus,

---

[14] *See Commonwealth v. Sandusky*, 77 A.3d 663 (Pa. Super. 2013), for the factual details of that case.

we conclude that the trial court's inquiry into Appellant's motion was procedurally sound.

Turning to the merits of the trial court's denial, at the evidentiary hearing Appellant argued that there were irreconcilable differences between himself and Attorney Muir for the following reasons: (1) Attorney Muir was not keeping him apprised of court dates or other important matters; (2) Attorney Muir was not investigating the forensic evidence; (3) Attorney Muir was not filing motions as Appellant requested; (4) Attorney Muir left in the middle of a discussion they were having at the jail; (5) their meeting ended in arguments; and (6) Attorney Muir failed to return Appellant's phone calls. Attorney Muir's testimony contradicted Appellant's testimony with respect to these perceived irreconcilable differences.

Attorney Muir testified that Appellant told his psychiatrist that "she sends me up to two to three letters a week. Sometimes she does not do everything I would like her to do but she does most everything." N.T., 2/7/12, at 29 (paragraph break omitted; complete capitalization removed). Attorney Muir also testified that, although she did not file every motion that Appellant requested, she carefully reviewed each of his suggestions to determine whether they involved meritorious issues that should be raised. *See id.* at 31. Furthermore, Attorney Muir testified that she accepted Appellant's phone calls whenever she was in the office. *See id.* at 30. Attorney Muir acknowledged that she and Appellant differed with respect to

some strategic decisions. *Id.* at 35. She explained, however, that she declined to file meritless motions because she did not want potential venire members to read about the case in the newspaper. *See id.* Attorney Muir also noted that she investigated the forensic evidence, as Appellant requested, and she consulted an expert regarding that evidence. *Id.* at 35-36. Finally, she stated that she did not believe that there were irreconcilable differences between herself and Appellant. *See id.* at 46.

It was the trial court's duty to determine whether Appellant's or Attorney Muir's testimony was more credible. It is evident from the record that the trial court concluded that Attorney Muir's testimony was credible while Appellant's testimony was not credible. It is well-settled that we cannot overturn a fact-finder's credibility determinations. *Stephan v. Waldron Elec. Heating & Cooling LLC*, 100 A.3d 660, 667 (Pa. Super. 2014) (citation omitted). Therefore, we conclude, based upon the trial court's credibility determinations, that no irreconcilable differences existed between Appellant and Attorney Muir.

Furthermore, even if we were to credit Appellant's testimony regarding his differences with Attorney Muir, we would conclude that the trial court correctly determined that no irreconcilable differences existed. This Court has affirmed trial courts' denial of motions for new counsel in circumstances in which the attorney-client relationship deteriorated far beyond the deterioration in the case at bar. For example, in *Commonwealth v. Neal*,

563 A.2d 1236 (Pa. Super. 1989), the defendant sought removal of trial counsel because she failed to file pretrial motions that the defendant requested and because she failed to meet with the defendant for the length of time he preferred. *Id.* at 1239–1240. The trial court denied the motion for appointment of new counsel and this Court affirmed that determination. *See id.* at 1242-1243.

In *Commonwealth v. Chew*, 487 A.2d 1379 (Pa. Super. 1985), the defendant "became dissatisfied with his counsel . . . because of a difference of opinion regarding strategy and because of what [the defendant] perceived as inadequate preparation for trial. This dissatisfaction continued at the time of trial. Shortly before trial started, [the defendant] spit in the face of his lawyer." *Id.* at 1383. This Court affirmed the denial of appointment of new counsel, holding that "differences of opinion concerning strategy or the brevity of pre-trial communications does not compel the appointment of new counsel." *Id.* Combined, *Neal* and *Chew* indicate that the complaints Appellant raised at the evidentiary hearing on his request for appointment of new counsel do not rise to the level of irreconcilable differences.

Appellant relies heavily upon *Commonwealth v. Tyler*, 360 A.2d 617 (Pa. 1976), in support of his argument that there were irreconcilable differences. In *Tyler*, our Supreme Court determined that the trial court abused its discretion in denying the defendant's request for new counsel. In

*Floyd*, this Court explained that the key to *Tyler* was that trial counsel admitted that there were differences between himself and the defendant; however, trial counsel refused to elaborate further because of the attorney-client privilege. *Floyd*, 937 A.2d at 500. Since trial counsel did not admit that there were irreconcilable differences between herself and Appellant, *Tyler* is distinguishable and does not support Appellant's claim for relief. Based upon the record before us, we conclude that the trial court did not abuse its discretion in denying Appellant's request for appointment of new counsel.

In his second issue, Appellant contends that his right to confrontation was violated when the Commonwealth failed to disclose any incentive it offered to Dunlap for his testimony. Although phrased as a Sixth and Fourteenth Amendment confrontation clause issue, Appellant essentially argues that the Commonwealth violated his Fourteenth Amendment right to due process of law, as set forth in *Brady v. Maryland*, 373 U.S. 83 (1963).

Our Supreme Court explained:

> To prove a *Brady* violation, Appellant must demonstrate that: (1) the prosecution concealed evidence; (2) which evidence was either exculpatory or impeachment evidence favorable to him and; (3) he was prejudiced by the concealment. In order to prove prejudice, Appellant must show a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Stated differently, the undisclosed evidence must be material to guilt or punishment. Further, impeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution

- 13 -

and the witness. Mere conjecture as to an agreement between the prosecution and witness is insufficient to establish a ***Brady*** violation, however.

***Commonwealth v. Bomar***, 104 A.3d 1179, 1189–1190 (Pa. 2014) (internal alterations, quotation marks, and citations omitted).

As noted above, Appellant made a pre-trial request for information regarding inducements the Commonwealth offered Dunlap for his testimony. The Commonwealth responded that no inducement was offered. Appellant thereafter filed a motion to dismiss for the Commonwealth's alleged ***Brady*** violation. The trial court held an evidentiary hearing on the motion to dismiss and concluded that the Commonwealth complied with ***Brady***; therefore, it denied Appellant's motion to dismiss.

Appellant claims that the docket sheets relating to Dunlap's pending criminal charges indicates that the Commonwealth had in fact offered Dunlap consideration in exchange for his testimony at trial. Specifically, Appellant notes that Dunlap's counsel requested a continuance and listed "client needed to testify/Commonwealth seeking cooperation" as the reason for the continuance. Furthermore, Appellant contends that the fact Dunlap pled guilty nine days after Appellant was sentenced in this matter evidences that an agreement between the Commonwealth and Dunlap existed.

We conclude that the Commonwealth fully complied with its obligations under ***Brady***. Specifically, the Commonwealth provided Appellant with a copy of Dunlap's criminal history which could be used to obtain court dockets

in possession of the trial court prothonotary. The Commonwealth also accurately stated that it had not made any deals with Dunlap in exchange for his testimony in this matter. At the hearing on Appellant's motion to dismiss, the assistant district attorney told Appellant and the trial court that Dunlap was currently incarcerated. The trial court stated Dunlap "may have some kind of expectation that down the road [he] might receive some kind of benefit." N.T., 4/16/12, at 10 (complete capitalization removed). The assistant district attorney responded "Correct." *Id.* (complete capitalization removed). The trial court then gave Appellant advice on how to use this information to impeach Dunlap. *See id.* at 11.

There is no evidence, presented by Appellant, from the record in this case or in Dunlap's case, that "a promise or an understanding between the prosecution and" Dunlap existed. *Bomar*, 104 A.3d at 1189-1190. To the contrary, at trial Dunlop was asked if he were "currently incarcerated at the Centre County Correctional Facility." N.T., 4/20/12, at 8 (complete capitalization removed). He confirmed that he was currently incarcerated at that facility. *Id.* at 9. Dunlap was then asked if the "Commonwealth promised you any deals for your testimony at all?" *Id.* (complete capitalization removed). He responded, "not at all." *Id.* (complete capitalization removed). Appellant only presents "[m]ere conjecture as to an agreement between the prosecution and" Dunlap. *Id.* at 1190. Such conjecture is insufficient to prove a *Brady* violation. *Bomar*, 104 A.3d at

- 15 -

1189-1990; ***Commonwealth v. Kinard***, 95 A.3d 279, 290 (Pa. Super. 2014) (*en banc*) (citations omitted); ***Commonwealth v. Tielsch***, 934 A.2d 81, 88 (Pa. Super. 2007), *appeal denied*, 952 A.2d 677 (Pa. 2008); ***Commonwealth v. Champney***, 832 A.2d 403, 412 (Pa. 2003) (citation omitted); ***Commonwealth v. Morales***, 701 A.2d 516, 522–523 (Pa. 1997). Accordingly, we conclude that the Commonwealth satisfied its ***Brady*** obligations.

In his third issue, Appellant argues that the trial court erred by permitting Trooper Neumyer to testify as an expert witness regarding ballistic evidence. "[Q]ualification of a witness as an expert rests within the sound discretion of the trial court, and the court's determination in this regard will not be disturbed absent an abuse of discretion." ***Commonwealth v. Malseed***, 847 A.2d 112, 114 (Pa. Super. 2004), *appeal denied*, 862 A.2d 1254 (Pa. 2004) (citation omitted). "The standard for qualifying an expert witness is a liberal one: the witness need only have a reasonable pretension to specialized knowledge on a subject for which expert testimony is admissible." ***Kinard***, 95 A.3d at 288 (citation omitted).

As this Court has explained:

> [E]xpert testimony is incompetent if it lacks an adequate basis in fact. While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. Rather, an expert's assumptions must be based upon such facts as the jury would be warranted in finding from the evidence.

> While an expert need not use magic words, the foundation of [his] opinion must still be sturdy. As our Supreme Court has emphasized, the expert must base the substance of [his] opinion on a reasonable degree of certainty instead of mere speculation.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 727 (Pa. Super. 2015) (citations omitted). We evaluate an expert's testimony in its entirety when determining if the opinions were given with reasonably certainty. *Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1259 (Pa. Super. 2008), *appeal denied*, 995 A.2d 350 (Pa. 2010).

Trooper Neumyer testified that at least two shots were fired from the vehicle driven by Appellant. N.T., 4/17/12, at 342. He also testified that the shots were fired from a semi-automatic or automatic shotgun. *Id.* at 336. He testified that one imperfection found on the shotgun shell components was caused by a piece of metal below the bore. *Id.* at 335. Trooper Neumyer testified that the shotgun shell components recovered from Ross' vehicle were consistent with the shotgun shell components recovered after test firing a firearm recovered from Appellant's father's residence. *Id.* at 338. He conceded, however, that he could not say definitively that the recovered firearm fired the shots at issue in this case. *See id.* at 338-341. Instead, he testified that he was at least 90% certain that the recovered firearm fired the shots at issue in this case. *Id.* at 341.

Appellant contends that Trooper Neumyer's "use of several equivocal terms in his testimony rendered [his testimony inadmissible]." Appellant's Brief at 79. In support of this argument, he cites *McMahon v. Young*, 276

A.2d 534 (Pa. 1971), and **Commonwealth v. Radford**, 236 A.2d 802 (Pa. 1968) (*per curiam*). Those cases, however, are distinguishable from the case at bar. In **McMahon**, our Supreme Court held that equivocal testimony in a medical malpractice testimony was not admissible. **McMahon**, 276 A.2d at 535. Our Supreme Court relied upon a special rule for medical malpractice actions, *i.e.*, an expert **must** testify as to causation. **See id.** (citation omitted). Thus, when that expert's testimony is equivocal, it is not admissible. **See id.** The case at bar is not a medical malpractice action and does not deal with medical causation. In **Radford**, the Commonwealth's only evidence as to legal causation was an expert witness. **Radford**, 236 A.2d at 803. Our Supreme Court stated that, after its review of the expert's testimony, it was insufficient to prove legal causation beyond a reasonable doubt. **Id.** Our Supreme Court did not hold that the expert's testimony was inadmissible. **See id.** Thus, **Radford** is properly understood as addressing a sufficiency challenge and not whether an expert's testimony was admissible.

Instead we find instructive **Commonwealth v. Hetzel**, 822 A.2d 747 (Pa. Super. 2003), *appeal denied*, 839 A.2d 350 & 839 A.2d 351 (Pa. 2003). In that case, the trial court permitted testimony that an expert witness' test showed that blood was possibly present. The defendant challenged the admission of that evidence, arguing that it was not given to a reasonable degree of scientific certainty. This Court held:

> [The expert] explained in detail the nature of the test she conducted as well as its limitations. Her opinion was not that the water surely contained blood, but rather that it had an indication of blood, a fact confirmed by the presumptive test she conducted. [The expert]'s opinion included her caveat that a vegetable substance, such as red beets, also may have caused the positive presumptive test. On cross-examination, [defendant's] counsel focused on the fact that the phenol test was not definitive for blood. . . . [This] is a case where the expert testified to performing a test and related the results of that test, as well as its limitations. In light of the restricted nature of [the expert's] testimony and the fact that the test's limitations were exposed, we find no basis for concluding that the expert testimony was improper.

*Id.* at 762. The same is true in the case at bar. The test conducted by Trooper Neumyer indicated that the shots were likely fired from the tested shotgun. He noted the limits of the test and that it was indeed possible that the shots were fired from a different shotgun.

Furthermore, Trooper Neumyer testified that he was at least 90% certain that the fired rounds came from the examined shotgun. In other words, he testified that the p-value was .10. He then testified that his opinion was given to a reasonable degree of scientific certainty, implying that a p-value of .10 was sufficient for a reasonable degree of scientific certainty. We agree that such a p-value is sufficient to show that he testified to a reasonable degree of scientific certainty. *See Riccio v. S&T Contractors*, 56 Pa. D. & C.4th 86 n.20 (C.C.P. Chester 2001) (internal quotation marks and citation omitted) ("a reasonable degree of medical certainty is equivalent to a statistical probability of [80%] or more."); *see also Kroeschell, Inc. v. Ill. Workers' Comp. Com'n*, 2014 WL 6908261,

*5 (Ill. App. Dec. 5, 2014) ("Kornblatt stated that a proposition had to be 80% or 90% true before he would say that he held it to a reasonable degree of medical certainty."); **Morris v. Sec'y of Health & Human Servs.**, 1992 WL 21874, *7 (Cl. Ct. Jan. 21, 1992) (holding that an expert's testimony that he was 90% certain equates to rendering an opinion to a reasonable degree of scientific certainty). Accordingly, we conclude that Trooper Neumyer's testimony, taken as a whole, was given to a reasonable degree of scientific certainty.

Finally, Appellant argues, in a single conclusory sentence, that the admission of Trooper Neumyer's testimony violated his constitutional right to a fair trial. This argument is waived for failure to develop it in any meaningful manner. **See** Pa.R.A.P. 2119(a); **Commonwealth v. Zewe**, 663 A.2d 195, 199 (Pa. Super. 1995), *appeal denied*, 675 A.2d 1248 (Pa. 1996). Accordingly, we conclude that the trial court did not abuse its discretion in admitting Trooper Neumyer's testimony.

In his fourth issue, Appellant argues that his sentence is illegal. As part of the aggregate sentence, Appellant was sentenced to 20 to 40 years' imprisonment for attempted murder. Appellant argues that this exceeded the statutory maximum penalty of 20 years' imprisonment. Whether a sentence is illegal is a question of law; therefore, our standard of review is *de novo* and our scope of review is plenary. **Commonwealth v. Veon**, 109 A.3d 754, 772 (Pa. Super. 2015) (citation omitted).

The Crimes Code provides:

[A] person who has been convicted of attempt, solicitation or conspiracy to commit murder, murder of an unborn child[,] or murder of a law enforcement officer where serious bodily injury results may be sentenced to a term of imprisonment which shall be fixed by the court at not more than 40 years. Where serious bodily injury does not result, the person may be sentenced to a term of imprisonment which shall be fixed by the court at not more than 20 years.

18 Pa.C.S.A. § 1102(c). "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Commonwealth v. Conaway*, 105 A.3d 755, 761 (Pa. Super. 2014), *quoting* *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). A defendant must be put on notice when the Commonwealth is seeking a 40-year maximum sentence for attempted murder. *Commonwealth v. Reid*, 867 A.2d 1280, 1283-1284 (Pa. Super. 2005), *appeal denied*, 890 A.2d 1058 (Pa. 2005).

Appellant first contends that he was not put on notice that the Commonwealth was pursuing attempted murder causing serious bodily injury. This argument is without merit. The information in this case alleged:

[O]n or about December 29, 2009, at SR 64, near Penny Lane, Walker Township, Centre County, Pennsylvania, with intent to commit the specific crime of [c]riminal [h]omicide, any act which constitutes a substantial step toward the commission of that crime, in that he did intentionally, knowingly, recklessly or negligently attempt to cause the death of another human being, in that he did fire a 12 gauge shotgun at Matthew Ross, **causing serious bodily injury**.

Information, 11/10/10, at 1 (emphasis added). Thus, Appellant was on notice of the Commonwealth's intent to pursue attempted murder causing serious bodily injury.

Appellant next contends that the jury did not find that the attempted murder caused serious bodily injury. In its instructions, the trial court did not inform the jury that in order to find Appellant guilty of attempted murder (so as to subject him to the 40-year maximum under 18 Pa.C.S.A. § 1102(c)) it must find that the attempted murder caused serious bodily injury. **See** N.T., 4/20/12, at 394-397. Furthermore, the jury did not answer a special interrogatory in which it found that the attempted murder caused serious bodily injury to Ross. **See** Verdict Slip, 4/20/14, at 1. The Commonwealth argues, however, that the jury's finding with respect to count two (aggravated assault) was sufficient to satisfy **Apprendi**. On the verdict form, the jury found that Appellant was guilty of aggravated assault because he caused serious bodily injury to Ross. **Id.**

This Court addressed this issue in **Commonwealth v. Johnson**, 910 A.2d 60 (Pa. Super. 2006) (*per curiam*), *appeal denied*, 923 A.2d 1173 (Pa. 2007). In **Johnson**, this Court considered[15] the same argument that the Commonwealth is making in the case at bar, *i.e.*, whether the jury's finding

---

[15] In **Johnson**, this Court raised the **Apprendi** issue *sua sponte*. Therefore, there were no briefs filed on the issue.

with respect to an aggravated assault charge was sufficient to prove that the

attempted murder charge involved serious bodily injury. This Court held:

> The fact that the jury may have considered the question of serious bodily injury when they were evaluating the Commonwealth's evidence supporting the charge of aggravated assault is not relevant to a sufficiency analysis on the separate charge of attempted murder where serious bodily injury results. The [c]ourts of Pennsylvania have consistently respected the authority of a jury to find, or to decline to find, the existence of each element of each criminal offense. Nor is there authority for a trial court to reason to a verdict of guilt by tacking the finding of culpability of one element of a companion offense on to a separate criminal offense upon which the jury had also rendered a verdict.

*Id.* at 68 n.10.[16]

Thus, under **Johnson** it is evident that Appellant's sentence is illegal.[17]

That, however, is not the end of our inquiry. In **Commonwealth v. Watley**, 81 A.3d 108 (Pa. Super. 2013) (*en banc*), this Court addressed a

---

[16] **Johnson** held, and we emphasize today, that it is immaterial whether there was sufficient evidence to conclude that the attempted murder caused serious bodily injury. Instead, the question is whether the jury made this factual finding in accordance with **Apprendi** and the interpretive case law of this Commonwealth.

[17] In its Rule 1925(a) opinion, the trial court concluded that the instant case is distinguishable from **Johnson** because "the jury specifically determined that seriously bodily injury was caused in connection with the aggravated assault verdict which the jury may not have considered in **Johnson**." Trial Court Opinion, 8/8/14, at 9 (internal alteration and quotation marks omitted); **see also** Commonwealth's Brief at 47 (advancing the same argument). In **Johnson**, however, like in the case at bar, the aggravated assault for which the defendant was found guilty was a companion offense to attempted murder. **Johnson**, 910 A.2d at 67, 68 n.10. That fact did not sway this Court. Instead, this Court concluded that the jury must find that the attempted murder caused serious bodily injury. Thus, **Johnson** is not distinguishable from the case at bar.

similar issue and came to a different conclusion. We conclude, however, that **Watley** is distinguishable from the case at bar and that this case is controlled by **Johnson**.

In **Watley**, the defendant was found guilty of possession with the intent to deliver ecstasy and two counts of carrying a firearm without a license. **Watley**, 81 A.3d at 112. The trial court sentenced him in accordance with 42 Pa.C.S.A. § 9712.1, which provides for a five-year mandatory minimum sentence for a person convicted of possession with intent to deliver while they are in physical control of a firearm. **Watley**, 81 A.3d at 112. While **Watley** was on direct appeal, the Supreme Court of the United States decided **Alleyne v. United States**, 133 S.Ct. 2151 (2013), in which it extended **Apprendi** to require that a jury find any fact (other than that of a prior conviction) which triggers application of a mandatory minimum sentence. This Court held that Watley's sentence did not violate **Alleyne** because the jury found that the defendant had control of a firearm while possessing ecstasy with the intent to deliver. This finding came when the jury adjudicated him guilty of the possession of a firearm without a license charges. **Watley**, 81 A.3d at 116-121. In other words, this Court found that the trial court could "tack[] the finding of culpability of one element of a companion offense on to a separate criminal offense upon which the jury had also rendered a verdict." **Johnson**, 910 A.2d at 68 n.10.

In *Watley*, this Court carefully examined *Johnson* and chose to distinguish the two cases instead of overruling *Johnson*. Specifically, this Court stated:

> [W]hile we allow inconsistent verdicts, that doctrine is used to prevent overturning convictions that are inconsistent with an acquittal on another charge, not to disregard a jury's factual findings on valid convictions. The fact that we accept a jury's ability to potentially exercise leniency does not require us to disregard, for purposes of sentencing, its uncontroverted determination of facts that subject a defendant to an increased punishment, **which under then-existing law did not have to be alleged in the criminal information**. Indeed, an acquittal is not considered a specific factual finding. More importantly, [*Johnson* did not involve] retroactivity concerns since *Apprendi* was decided well before the defendant['s] trial[] in th[at] case[]. Phrased differently, the Commonwealth in *Johnson* [] could have simply followed *Apprendi,* whereas here, the prosecution was proceeding under prevailing law.

*Watley*, 81 A.3d at 119-120 (internal citation omitted; emphasis added).

Thus, this Court did not overturn *Johnson*. Instead, this Court held that tacking is permissible when there is a change in the law, after a criminal information has been filed, requiring that certain facts be found by a jury which could previously be found by a judge. In this case, *Apprendi* was decided well before the criminal information was filed. Thus, *Watley* is distinguishable from the case at bar and *Johnson* governs the disposition of this case. As noted above, under *Johnson*, Appellant's sentence for attempted murder is illegal because the record fails to establish that the jury made the requisite serious bodily injury finding. Accordingly, we are

constrained to vacate Appellant's judgment of sentence for attempted murder causing serious bodily injury.[18]

As vacating Appellant's sentence for attempted murder "may upset the overall sentencing scheme vis-a-vis Appellant's other convictions, we vacate the entire judgment of sentence" and remand for resentencing. **Conaway**, 105 A.3d at 765 (citation omitted); Trial Court Opinion, 8/8/14, at 10 (requesting that if we vacate the attempted murder sentence that we remand for resentencing on all counts). Furthermore, as we have determined that we must remand this matter for resentencing, we do not reach Appellant's discretionary aspects claim.

---

[18] For clarity, in order for the 40-year maximum penalty for attempted murder to be applicable: (1) the Commonwealth must put a defendant on notice that it is seeking the increased penalty (preferably by noting in the criminal information that the attempted murder caused serious bodily injury); (2) the trial Court must instruct the jury that if it finds the defendant guilty of attempted murder it must then determine if that attempted murder caused serious bodily injury; and (3) the jury must indicate on the verdict form that it finds the attempted murder caused serious bodily injury. Since 18 Pa.C.S.A. § 1102(c) does not require the trial court to make a finding with regard to serious bodily injury at a sentencing hearing, but instead includes this enhanced offense within the definition of attempted murder, our decisions in **Commonwealth v. Valentine**, 101 A.3d 801 (Pa. Super. 2014), and **Commonwealth v. Newman**, 99 A.3d 86 (Pa. Super. 2014) (*en banc*), are not implicated.

Judgment of sentence affirmed in part and vacated in part. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/2/2015